1  DYLAN J. LIDDIARD, State Bar No. 203055
   DALE R. BISH, State Bar No. 235390
2  CHARLES A. TALPAS, State Bar No. 308505
   MIKAELA BURKHARDT, State Bar No. 328112
3  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
4  650 Page Mill Road
   Palo Alto, CA 94304-1050
5  Telephone:  (650) 493-9300
   Facsimile:  (650) 565-5100
6  Email:  dliddiard@wsgr.com

7  Attorneys for Petitioner
   Equicare Health Inc.

8
                   UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
                        SAN JOSE DIVISION
11

12
   EQUICARE HEALTH INC.,                 )   CASE NO.:  21-MC-80183
13                                       )
              Petitioner,                )   **MEMORANDUM OF POINTS AND**
14                                       )   **AUTHORITIES IN SUPPORT OF**
        v.                               )   **EQUICARE HEALTH INC.'S**
15                                       )   **PETITION TO VACATE OR**
                                         )   **CORRECT ARBITRATION**
   VARIAN MEDICAL SYSTEMS, INC.,         )   **AWARD**
16                                       )
              Respondent.                )
17                                       )   Date:
                                         )   Time:
18                                       )   Before:
   _____)   Courtroom:
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELIEF SOUGHT ................................................................................. 1

STATEMENT OF ISSUES TO BE DECIDED .................................................................. 1

JURISDICTION AND VENUE ........................................................................................... 1

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

    BACKGROUND .................................................................................................. 3

    HISTORY OF THE RESELLER RELATIONSHIP ................................... 3

    THE SARA AND CONTINUED SALES GROWTH ................................. 4

    THE TARA AND THE FY 2016 SALES DECLINE ................................. 5

    THE DISPUTE .................................................................................................... 5

    PRE-HEARING ARBITRATION PROCEEDINGS ................................. 6

        *The Demand for Arbitration* ................................................................. 6

        *Arbitrator Selection* .............................................................................. 7

        *The Audit Dispute* ................................................................................. 8

        *Ms. Ta's Withdrawal from the Arbitration* ....................................... 9

        *The Original Audit Order* ..................................................................... 9

        *Ms. Ta's Return to the Arbitration* ................................................... 11

    THE EVIDENTIARY HEARING ................................................................. 11

        *Smoking-Gun Documents Prove Breach* ......................................... 11

        *Equicare's Damages* .......................................................................... 13

        *Varian's Defense* ................................................................................. 14

    THE AWARD IS INEXPLICABLE .............................................................. 15

    THE UNDISCLOSED RELATIONSHIP .................................................... 16

ARGUMENT ......................................................................................................................... 17

I.     EVIDENT PARTIALITY BASED ON NONDISCLOSURE OF ARBITRATOR
       DOSKER'S ATTORNEY-CLIENT RELATIONSHIP WITH MS. TA .................. 18

    A.    LEGAL STANDARD ................................................................. 18

        B.       ARBITRATOR DOSKER'S NONDISCLOSURE CREATES A "REASONABLE IMPRESSION OF PARTIALITY" ................................................................... 19

II.       THE PANEL EXCEEDED ITS POWER RELATED TO THE AUDIT ........................ 20

        A.       LEGAL STANDARD.................................................................................... 20

        B.       THE PANEL'S DECISION TO REJECT THE INDEPENDENT AUDITOR'S CONCLUSIONS WAS IN EXCESS OF POWER BECAUSE IT WAS NOT "DERIVED FROM THE AGREEMENT" .......................................................................... 21

III.     THE PANEL'S DENIAL OF DAMAGES FOR VARIAN'S BREACH OF CONTRACT WAS IN MANIFEST DISREGARD OF THE LAW ............................... 22

        A.       LEGAL STANDARD.................................................................................... 22

        B.       THE PANEL RECOGNIZED AND IGNORED APPLICABLE LAW ................................... 22

CONCLUSION ....................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Companies, Inc. v. Dobson,*
    513 U.S. 265 (1995) ......................................................................................................18

*Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC,*
    913 F.3d 1162 (9th Cir. 2019) ................................................................................21, 22

*Comedy Club, Inc. v. Improv West Assocs.,*
    553 F.3d 1277 (9th Cir. 2009) ................................................................................23, 25

*HSMV Corp. v. ADI Ltd.,*
    72 F. Supp. 2d 1122 (C.D. Cal. 1999) ............................................................................20

*Lucile Packard Children's Hosp. v. U.S. Nursing Corp.,*
    2002 U.S. Dist. LEXIS 10019 (N.D. Cal. May 29, 2002) ..............................................19

*Monster Energy Co. v. City Bevs., LLC,*
    940 F.3d 1130 (9th Cir. 2019) ........................................................................................19

*Morgan Keegan & Co. v. Grant,*
    2010 U.S. Dist. LEXIS 152839 (C.D. Cal. June 30, 2010) .............................................19

*New Regency Prods., Inc. v. Nippon Herald Films, Inc.,*
    501 F.3d 1101 (9th Cir. 2007) ............................................................................19, 20, 21

*Pacific Motor Trucking Co. v. Automotive Machinists Union,*
    702 F.3d 176 (9th Cir. 1983) ..........................................................................................21

*Rosenhaus v. Jackson,*
    2016 U.S. Dist. LEXIS 122398 (C.D. Cal. Feb. 26, 2016) .............................................20

*Sargon Enters., Inc. v. Univ. of S. Cal.,*
    55 Cal. 4th 747 (2012) ............................................................................................ *passim*

*Schmitz v. Zilveti,*
    20 F.3d 1043 (9th Cir. 1994) ................................................................................18, 19, 20

*Theis Research, Inc. v. Brown & Bain,*
    400 F.3d 659 (9th Cir. 2005) ............................................................................................2

*Valrose Maui, Inc. v. Maclyn Morris, Inc.,*
    105 F. Supp. 3d 1118 (D. Haw. 2000) ............................................................................20

**Statutes**

9 U.S.C. § 10(a)(2) .................................................................................................................18

9 U.S.C. § 10(a)(4) ...................................................................................................18, 21, 23

28 U.S.C. § 1332 .......................................................................................................................1

CAL. CODE CIV. P. Section 1281.9 ..................................................................................20

Federal Arbitration Act, 9 U.S.C. § 10 *et seq.* ............................................................ *passim*

MP&A ISO EQUICARE'S PETITION TO
VACATE ARBITRATION AWARD
CASE NO.: 21-MC-80183

Petitioner Equicare Health Inc. ("Equicare") respectfully asks the Court to vacate the arbitration award issued on July 12, 2021 (the "Award") in the American Arbitration Association ("AAA") proceeding against Respondent Varian Medical Systems, Inc. ("Varian"), captioned *Equicare Health Inc. v. Varian Medical Systems, Inc.*, AAA Ref. No. 01-19-0002-4132 (the "Arbitration"), arbitrators Richard Chernick, Mark Dosker and Abraham Sofaer presiding (individually, an "Arbitrator"; collectively, the "Panel").

## STATEMENT OF RELIEF SOUGHT

Equicare seeks an order vacating, or alternatively modifying, correcting and/or amending the Award pursuant to 9 U.S.C. § 10 *et seq*.

## STATEMENT OF ISSUES TO BE DECIDED

The issues to be decided are: (i) whether an Arbitrator's nondisclosure and/or false disclosure of his direct attorney-client relationship with Varian's counsel, which the Arbitrator had a duty to disclose, warrants vacatur under the "evident partiality" standard; (ii) whether the Award should be vacated because the Panel exceeded its power; and (iii) whether the Award should be vacated because it is in manifest disregard of the law.

## JURISDICTION AND VENUE

This Court has jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states. Varian is a citizen of California, and Equicare is a citizen of British Columbia, Canada. *See Theis Research, Inc. v. Brown & Bain*, 400 F.3d 659 (9th Cir. 2005). By agreement, the parties consented to this Court's jurisdiction and venue for matters related to the Arbitration.

## INTRODUCTION

The premise and credibility of private arbitration as an alternative to judicial proceedings depends on the impartiality of arbitrators. That is why an undisclosed conflict of interest, like the one at issue here, is one of the few circumstances in which courts will vacate an arbitral award.

Here, Arbitrator Dosker failed to disclose his prior attorney-client relationship with Quyen Ta, Varian's lead counsel in the Arbitration. A few years before the Arbitration, Ms. Ta represented Arbitrator Dosker—individually—and his law firm, Squire Patton Boggs LLP

1  ("SPB"), in a malpractice action.  Undoubtedly, they both remembered the matter.

2       Had the relationship been disclosed at the outset, Equicare would have had the right to

3  disqualify, and would have disqualified, Arbitrator Dosker.  It would not have been hypersensitive

4  for Equicare to entertain doubts regarding his impartiality toward the attorney who defended him—

5  personally—in a high-profile malpractice action.   Indeed, AAA and the ethical rules require

6  disclosure of attorney-client relationships for precisely that reason.

7       But Arbitrator Dosker never disclosed the attorney-client relationship during the two-year

8  Arbitration, even though AAA asked and required him to disclose it.  Under those circumstances,

9  no reasonable litigant in Equicare's position *could* have had confidence in his impartiality.

10      By itself, the undisclosed conflict warrants vacatur.  Unfortunately, Equicare did not learn

11  of the relationship until after the five-day evidentiary hearing concluded and the Panel issued the

12  Award, which was evidently penned by Arbitrator Dosker.  At least two problems with the Award

13  were so inexplicable that Equicare was compelled to investigate potential conflicts of interest.

14      *First*, Varian replaced Ms. Ta with new counsel nine months after the Arbitration began.

15  Six months after her withdrawal, the Panel issued an order deciding against Varian on a key

16  contract interpretation question worth millions of dollars.  Varian immediately re-engaged Ms. Ta

17  as lead counsel, who wrote a thirty-page, single-spaced letter excoriating the Panel for the decision.

18  Subsequently, in the final Award, the Panel reached the opposite conclusion on—literally—the

19  exact same contract interpretation question and thereby denied Equicare significant damages.

20      It was a blatant flip-flop.  Moreover, the particular question that the Panel flip-flopped on

21  concerned its own contractual authority to review the findings of a party-appointed independent

22  auditor. In its initial order on the subject, the Panel held that it did not have authority under the

23  parties' agreements to review the findings of the independent auditor.  Nonetheless, in the Award,

24  the Panel pointed to the same contractual provision and held that it conferred authority to review

25  the audit findings.  Thus, the Panel exceeded its own previously determined power when it decided

26  to review—and reject—the auditor's findings.

27      *Second*, the Panel found that Varian was liable for breach of contract because it did not try

28  to sell Equicare products, instructed its sales staff not to sell Equicare and took affirmative steps

to prevent Equicare sales.  Yet, under an arbitrary and unidentified standard of its own invention, the Panel held that it "[could not] award damages for the breach."  The Panel correctly identified *Sargon Enters., Inc. v. Univ. of S. Cal.*, 55 Cal 4th 747 (2012) ("*Sargon*") as the applicable standard for calculating lost profit damages under California law, which was basis of Equicare's damages model.  But the Panel inexplicably ignored *Sargon*—despite its admitted "mindful[ness]" of it— which demonstrates that the decision was "in manifest disregard of the law," not simply a mistake.

The Award should be vacated.[1]

## STATEMENT OF FACTS

### BACKGROUND

Varian is a large publicly traded company based in Palo Alto, California that is best known as a manufacturer of linear accelerators and other equipment used for radiation therapy.[2]  Varian also markets a line of software products frequently sold in connection with its linear accelerators. As is relevant here, Varian markets an oncology-specific electronic medical record ("EMR") software, known as the ARIA Oncology Information System ("ARIA").[3]

Equicare is a privately held company based in Vancouver, British Columbia that develops oncology care coordination software.  Its products ("ECS" and "APP") are not EMR software products.  Rather, they are end-to-end care coordination solutions that work with an oncology department's EMR software, a hospital's electronic health records ("EHR") software and other systems involved throughout a cancer patient's treatment, from diagnosis through survivorship.[4]

### HISTORY OF THE RESELLER RELATIONSHIP

Equicare and Varian established a reseller relationship in 2007 and worked closely to achieve a high level of integration between ARIA and Equicare.  Between 2009 and 2013, Varian's sales of Equicare products grew consistently year-over-year, as did its pipeline of future Equicare sales.  Internally, Varian projected that sales growth would continue through at least 2018.[5]

The combined ARIA-Equicare offering was so successful that Varian tried to acquire

---

[1] The Award is attached as Ex. 1 to the Declaration of Dylan J Liddiard ("Liddiard Decl.").
[2] Varian was acquired by Siemens Healthineers AG during the pendency of the Arbitration.
[3] *See* Ex. 1 at 2-3.
[4] *See* Ex. 1 at 2-3, 15 & n.6.
[5] *See* Ex. 1 at 5 & n.3.

Equicare in 2013.  Varian informed Equicare that, if the acquisition failed, Varian would develop its own competitive product.  Ultimately, the parties reached an impasse and negotiations terminated.  Thereafter, Varian began to develop its own care coordination software, known internally as "Project HALO" (upon its release, the product was known as "360 Oncology").[6]

Despite Varian's stated intent to develop a competitive product, the parties decided to continue the reseller relationship, since HALO development would take several years and Varian wanted to continue to offer Equicare functionality to customers.  Accordingly, the parties entered into the Second Amended Reseller Agreement (the "SARA") on August 25, 2014, which extended the relationship through September 30, 2016.[7]

### THE SARA AND CONTINUED SALES GROWTH

The SARA struck a delicate balance that was fair to both parties, in light of Varian's HALO development plans.  Varian obtained the right to develop a competitive product *and* retained the right to offer Equicare's well-accepted solution at the same time.  In exchange, Varian committed to promote and sell Equicare products *actively* for the term of the agreement, agreed to certain protections related to Equicare's install base and confidential information.[8]

Under Section 2.2 of the SARA, Varian agreed to make "reasonable commercial effort" to achieve annual sales targets of Equicare products.  *See* JX002 at § 2.2.  As provided in the SARA, the sales target for the "annual period ending September 30, 2015," which corresponded with Varian's FY 2015, was $3 million.  JX002 at 21.  The parties agreed to "negotiate the value of the Varian Sales Target for each subsequent period in good faith."  Ex. 1 at 7; JX002 at 21

The continued relationship worked well initially, despite Varian's plans to develop a competitive product. Varian's consistent growth in Equicare sales continued through FY 2015, *i.e.*, first year of the SARA.  Indeed, Varian sold over $5 million in Equicare products during FY 2015, well in excess of the $3 million sales target under the SARA.  *See* Ex. 1 at 7.

That momentum showed no signs of stopping.  By October 2015, the start of FY 2016,

---

[6] *See* Ex. 1 at 5.
[7] *See* Ex. 1 at 5-6.  The SARA is attached as JX002 to the Liddiard Declaration.  Section 17.4 of the SARA contains the relevant arbitration provision.  JX002 at § 17.4.
[8] *See* Ex. 1 at 5-7.

Varian's pipeline of potential Equicare sales was robust and included more than two hundred opportunities.[9]  In fall 2015, Varian initiated negotiations with Equicare regarding the extension of the relationship through September 30, 2018, with increased sales targets.[10]

The parties ultimately reached an agreement on terms for the Third Amended Reseller Agreement (the "TARA"), which was executed on June 8, 2016.[11]

### THE TARA AND THE FY 2016 SALES DECLINE

Under Section 2.2 of the TARA, Varian agreed to make "reasonable commercial effort" to achieve annual sales targets of Equicare products.  JX003 at § 2.2.  The sales target for the "annual period ending September 30, 2016" (Varian's FY 2016) was $5 million.  *Id.*

Varian's sales of Equicare products fell off a cliff during FY 2016, down roughly 90% compared to FY 2015.  *See* Ex. 1 at 14.  Moreover, on September 26, 2016—days before the end of FY 2016—Varian announced the launch of its competitive product, 360 Oncology, at a large industry trade show.  Thereafter, Varian sold effectively nothing in FY 2017 and FY 2018, despite its obligation to use commercially reasonable efforts to sell Equicare products.[12]

### THE DISPUTE

In late 2018, Equicare and Varian attempted to resolve their dispute informally.[13]  The parties engaged outside counsel to negotiate: Equicare engaged Dylan Liddiard of Wilson Sonsini Goodrich & Rosati, P.C. ("WSGR") and Varian engaged Quyen Ta of Boies Schiller Flexner LLP ("BSF").[14]  During those negotiations, Equicare raised three issues with Varian.

First, Equicare contended that Varian failed to use commercially reasonable efforts to sell Equicare products between FY 2016 and FY 2018, in breach of Section 2.2 of the TARA.  While Varian denied that it had changed its efforts to sell Equicare products after FY 2015, the dramatic decline (pictured *infra* p. 14) did not appear consistent with any organic downturn in sales.  Further, a former Varian employee had suggested to Equicare that Varian stopped selling Equicare products

---

[9] *See* Ex. 1 at 12, n.5.
[10] *See* Ex. 1 at 7.
[11] *See* Ex. 1 at 7.  The TARA is attached as JX003 to the Liddiard Declaration.  Section 17.4 of the TARA contains the relevant arbitration provision.  JX003 at § 17.4.
[12] *See* Ex. 1 at 12-14.
[13] *See* Liddiard Decl. ¶ 2.
[14] *See* Liddiard Decl. ¶ 2.

1   in FY 2016 in anticipation of its expected launch of 360 Oncology. *See* CX1562.

2        Second, the same former Varian employee told Equicare that the Project HALO

3   development team made no effort to shield themselves from confidential information regarding

4   Equicare. *See* CX1562. Under the SARA and the TARA, other Varian teams were allowed to

5   access confidential Equicare information in connection with joint effort to maintain

6   interoperability between ARIA and Equicare.[15] However, both agreements expressly prohibited

7   access to confidential Equicare information by the Project HALO development team.[16]

8        Third, Varian had long acknowledged its own operational shortcomings related to: (i) the

9   tracking and issuance of purchase orders for software support agreements sold in connection with

10   Equicare products; and (ii) timely implementation of several million dollars in Equicare orders,

11   which had been left to languish on a growing backlog list.[17] Equicare had the right to conduct an

12   independent audit of such orders pursuant to Section 2.7 of the reseller agreements.[18] Varian

13   indicated that it would allow an audit and consented to the selection of an independent auditor,

14   but—at the same time—Varian did not allow the audit to proceed because it disputed the proposed

15   scope of the audit. *Infra,* pp. 8-10.

16        The parties attempted to resolve their claims during a June 2019 mediation session, which

17   was unsuccessful. At that point, Equicare had no choice but to commence the Arbitration with

18   AAA, as provided under the parties' reseller agreements. *See* JX002 at § 17.4; JX003 at § 17.4.

19   **PRE-HEARING ARBITRATION PROCEEDINGS**

20     *The Demand for Arbitration*

21        On August 2, 2019, Equicare submitted its initial demand for arbitration and statement of

22   claims with AAA, which included claims against Varian for breach of contract under Section 2.2

23   of the SARA and the TARA. Subsequently, Equicare amended its demand for arbitration to add

24   a claim for Varian's failure to comply with the audit provisions in Section 2.7 of the reseller

25   agreements.[19]

26

---

27   [15] *See* Ex. 1 at 13-14.
  [16] *See* Ex. 1 at 13-14.
  [17] *See* Ex. 2 (Amended Statement of Claims) at ¶¶ 17-18.

28   [18] *See* Ex. 2 at ¶¶ 46-53.
  [19] *See* Ex. 2 at ¶¶ 46-53, 59.

The parties agreed that the Arbitration would proceed under the AAA Rules for Commercial Arbitration the Federal Arbitration Act ("FAA"). *See, e.g.,* Ex. 3.

*Arbitrator Selection*

On August 12, 2019, AAA directed the parties to complete a "Checklist for Conflicts" form that requested a list of "all interested parties in this case, including but not limited to, witnesses, consultants and attorneys." *See* Ex. 4. AAA provides completed forms to arbitrators in connection with their conflict disclosure requirements. Assuming Varian submitted the form, Ms. Ta should have listed herself as an attorney for Varian.

On October 4, 2019, AAA sent the parties a list of fifteen potential arbitrators, which included among them Arbitrators Dosker and Sofaer. *See* Ex. 5. The parties reviewed the list and returned their confidential "rank and strike" preferences to AAA.[20]

On November 8, 2019, AAA informed the parties that Arbitrators Dosker and Sofaer had been appointed to the Panel, along with M. Scott Donahey. *See* Ex. 6. AAA enclosed copies of the "CA Arbitrator Oath Form," which included a completed conflict of interest questionnaire for each appointed arbitrator. Ex 7 (Dosker); Ex. 8 (Sofaer); Ex. 9 (Donahey).

Arbitrator Dosker responded "NO" to each question in his "CA Arbitrator Oath Form." *See* Ex. 7. Most relevant here, Question No. 14 asked: "Do you have, or have you had any attorney-client relationship with a party or a lawyer for a party?" *Id.* at 4. Arbitrator Dosker undoubtedly knew that Ms. Ta personally represented him through at least 2014 in a malpractice action (*infra* p. 17), but he nevertheless responded "NO" to Question No. 14. Ex. 7 at 4.

Unlike Arbitrator Dosker, Mr. Donahey disclosed a number of connections that he and his wife had with Varian in his "CA Arbitrator Oath" Form (*see* Ex. 9), which led both parties to object to Mr. Donahey's appointment.[21] Arbitrator Sofaer also disclosed conflicts (Ex. 8), but neither party objected. Accordingly, AAA invited Arbitrators Dosker and Sofaer to select a third arbitrator to chair the Panel.[22]

On January 4, 2020, AAA informed the parties that Arbitrators Dosker and Sofaer had

---

[20] *See* Liddiard Decl. at ¶ 4.
[21] *See* Liddiard Decl. at ¶¶ 5-6.
[22] *See* Liddiard Decl. at ¶¶ 5-7.

MP&A ISO EQUICARE'S PETITION TO
VACATE ARBITRATION AWARD
CASE NO.: 21-MC-80183

appointed Arbitrator Chernick to chair the Panel.  *See* Ex. 10.  Neither party objected, and the Panel's composition was confirmed.[23]

### *The Audit Dispute*

In the early stages of the Arbitration, the audit was a key issue.  The parties also agreed on a number of audit-related issues but engaged the Panel on a limited basis.

The parties had agreed on an independent auditor and that an audit would streamline the Arbitration by narrowing the issues to be submitted to the Panel.  *See* Ex. 11 (Order No. 2) at 1. Specifically, with respect to Varian's failure to issue purchase orders for SSAs and failure to implement backlogged orders, the independent auditor would determine the amounts owed.  Thus, the parties would not need to present evidence regarding more than one hundred and fifty separate transaction at the hearing.  Ex. 11 at 1.

However, the parties could not agree—and asked the Panel to resolve disputes—regarding the scope of the audit, as well as the applicability of Varian's statute of limitations and novation affirmative defenses to amounts owed under the audit.  Ex. 11 at 1.  The Panel ordered the audit to proceed and determined the scope of the audit, but the Panel reserved decision on Varian's statute of limitations and novation affirmative defenses until the merits hearing.  Ex. 11 at 2-3.  As the Panel held: "The audit itself will likely define more precisely what further evidence may be needed to rule on the [statute of limitations] defense."  Ex. 11 at 3.

During the course of the audit, Varian repeatedly argued that "audit-related materials and information should be barred from use in this arbitration" and asked the Panel to cut Equicare out of the audit process.[24]  According to Varian, Equicare was not allowed to access the database of materials provided to the auditor nor communicate with the auditor regarding information about the audit.[25]  Varian insisted that the auditor could report "only the amount of revenue or fees due to [Equicare]" and could not share "any other information [he] may discover in the course of the audit," including with the Panel.[26]

---

[23] *See* Liddiard Decl. at ¶¶ 5-7.
[24] *See* Liddiard Decl. at ¶¶ 9-11;  Ex. 11 (Order No. 2) at 4; Ex. 12 (Order No. 5) at 2; Ex. 13 (Order No. 6) at 1; Ex. 14 (Stipulated Protective Order) at §§ 5.3, 7.3.
[25] *Id.*
[26] *Id.*

As Varian advocated, the Panel issued a number of orders that ensured the audit would be kept separate from the Arbitration hearing, aside from the applicability of Varian's statute of limitations and novation affirmative defenses.[27]   Accordingly, there would be no way to re-litigate the auditor's findings in the Arbitration, since Equicare and the Panel were allowed to know only the final amount due.  *See* Ex. 14 at §§ 5.3, 7.3.

The audit was a contentious and expensive process, mostly because Varian attempted to stonewall the independent auditor, and Equicare was forced to seek relief from the Panel while— at the same time—the auditor was not allowed to inform Equicare's counsel about his discussions with Varian nor what information Varian had provided to him.  *See* Liddiard Decl. at ¶¶ 9-11; Ex. 12 at 2; Ex. 13 at 1.

### *Ms. Ta's Withdrawal from the Arbitration*

The parties required frequent Panel intervention to resolve disputes related to the audit and discovery issues.  Curiously, as those slogging disputes began to intensify, Varian decided to replace Ms. Ta and BSF with new counsel.[28]   On May 12, 2020, Varian's new lead counsel, Quinlan Tom of Wendel Rosen LLP ("Wendel Rosen"), formally notified the Panel of Varian's decision to replace Ms. Ta and BSF with Wendel Rosen.[29]

Following Ms. Ta's replacement, Varian was required to produce devastating emails that confirmed Equicare's allegations.  *Infra* pp. 11-13.  And, in August 2020, despite Varian's obstructive behavior, the independent auditor finally was able to complete the audit and found that Varian owed Equicare millions of dollars.  *See* Liddiard Decl. at ¶¶ 9-11, 13.

### *The Original Audit Order*

The independent auditor completed the audit and submitted a final report to the parties on August 14, 2020, which found that Varian owed roughly $1.9 million to Equicare, plus the costs of the audit under the fee shifting provisions of Section 2.7 or the reseller agreements.[30]   Given the amount of time and money spent on the audit during the Arbitration—and given Varian's prior

---

[27] *See* Ex. 14 at §§ 5.3, 7.3; Ex. 12 at 2; Ex. 13 at 1.
[28] *See* Liddiard Decl. at ¶¶ 9-12.
[29] *See* Liddiard Decl. at ¶ 12.
[30] *See* Liddiard Decl. at ¶ 13; CX1581 (Audit Report); Ex. 1 at 16-17.

assurances that it "welcomed" the audit—Equicare was stunned when Varian refused to pay.[31] The parties briefed the Panel regarding how to resolve the issue of Varian's refusal to pay.[32]

Equicare argued that, under Section 2.7 of the SARA and the TARA, Varian's was required to pay the amounts owed within thirty days of receipt of an invoice for amounts determined to be owed by the auditor.[33]  Equicare also argued that, under Section 2.7, there was no mechanism to challenge the auditor's findings.[34]  Indeed, prior to the final audit report, Varian itself had argued vociferously that the audit must remain separate from the Arbitration, aside from the statute of limitations or novation defenses that the Panel expressly reserved.  *See* Ex. 15 at 5-6, n.6.

Further, because of Varian's earlier protests, Equicare was not allowed to discuss the audit with the independent auditor and was not allowed to have access to the materials provided to the auditor.  *Supra* pp. 9-10.  Thus, there was no way for Equicare to defend the auditor's findings at the Arbitration hearing.  *Id.*  Accordingly, Equicare asked the Panel to order Varian to pay any amounts not subject to a statute of limitations or novation defense and to identify precisely which amounts were subject to such defenses.  *See* Ex. 15 at 1.

Varian, on the other hand, completely changed its earlier position and argued that it should be allowed to challenge the auditor's conclusions—wholesale—at the hearing.[35]  Varian specifically argued that Sections 2.7 (the audit provision) and 17.4 (the arbitration provision) of the SARA and the TARA did not prohibit the Panel from reviewing the auditor's findings.  *Id.*

On November 12, 2020, the Panel sided with Equicare in Pre-Hearing Order No. 8.  The Panel summarized its rejection of Varian's contention:

> [Varian] amplified on its position in the Joint Statement that it was entitled to a hearing on the merits of its position about the audit determination, relying on the arbitration provision of the SARA and the TARA, Section 17.4 of each agreement, which provides that any dispute between the parties that cannot be amicably settled must be settled by final and binding arbitration.  [Varian's] assertion ignores the provisions of Section 2.7 of each Agreement.

Ex. 16 (Order No. 8) at 3.  As the Panel held regarding its own authority to review the auditor's

---

[31] *See* Liddiard Decl. at ¶¶ 9-11, 13; Ex. 16 at 1; Ex. 15 at 1.
[32] *See* Ex. 15 (Nov. 9, 2020 Joint Letter Brief).
[33] *See* Ex. 15 at 1.
[34] *See* Ex. 15 at 1, 3-5.
[35] *See* Ex. 15 at 7-10.

findings, interpreting Sections 2.7 and 17.4:

> This wording plainly is an agreement between the parties that as to any audit claims, the audit results are final and binding on the parties.  There is no conflict with the arbitration provisions of the agreements which must be read together with the audit provisions of the agreements.  The only limitation on the final nature of the audit determination is the provision of Order No. 2 which expressly deferred resolution of any issue on the statute of limitations and any issue of novation, either of which may or may not affect some of the determinations made in the audit report.

*See* Ex. 16 at 3.  The Panel ordered Varian to "provide a precise identification of any determination in the audit report that [Varian] asserts is subject to its affirmative defenses of the statute of limitations or its affirmative defense of novation." *Id.*

### *Ms. Ta's Return to the Arbitration*

After the original audit order, Varian re-engaged Ms. Ta as lead counsel in the Arbitration.[36]  Ms. Ta ignored Order No. 8 and submitted a thirty-page, single-spaced letter that excoriated the Panel for its conclusions and threatened to vacate the Panel's order if Varian was not allowed to challenge the auditor's report" at the evidentiary hearing.  *Id.*  The arguments advanced by Ms. Ta were not new, and the Panel had already rejected them in prior orders related to the audit.[37]

### THE EVIDENTIARY HEARING

The evidentiary hearing was held on May 17-21, 2021.  Due to the pandemic, the hearing was held via video-conference.  Nevertheless, the Arbitrators' video feeds were displayed to the parties at all times, as were the video feeds of questioning and defending attorneys for each party.  Ms. Ta gave opening remarks on behalf of Varian and questioned or defended nearly all of the fifteen witnesses during the hearing.  In short, Arbitrator Dosker saw Ms. Ta on video for the better part of five days—fully aware of their undisclosed prior relationship—but said nothing.[38]

### *Smoking-Gun Documents Prove Breach*

Varian produced countless smoking-gun emails that confirmed it had stopped selling Equicare products during FY 2016, in anticipation of its planned launch of 360 Oncology.  In fact, as the documents showed, Varian exerted considerably more effort to prevent sales.  Equicare

---

[36] *See* Liddiard Decl. at ¶¶ 12-14.
[37] *See* Ex. 15; Ex. 16.
[38] *See* Liddiard Decl. at ¶ 15.

presented a substantial volume of such documents at the evidentiary hearing.[39]  As the Panel found in its Award, Equicare satisfied its burden of proof with respect to all of its central arguments concerning Varian's breach of contract.

Varian planned to sell at least $5 million in Equicare products during FY 2015, but the revenue would "transition from Equicare over to Varian" once HALO was ready.[40]  Varian's goal was to release HALO by the end of FY 2016, after which it would not need Equicare.[41]  Varian sold over $5 million in Equicare products during FY 2015, as planned.[42]

For FY 2016, however, Varian did not include Equicare in its revenue plan.[43]  Rather, Varian's sole focus for FY 2016 was the aggressive commercialization of HALO, which it planned to launch in late September 2016, i.e., the last month of Q4 FY 2016.[44]  Throughout FY 2016, Varian began positioning HALO to existing Equicare customers (a clear breach of the reseller agreement) and drained nearly all of the 200 opportunities that had been in the Equicare pipeline at the end of FY 2015.[45]

Varian set an internal goal to achieve ten customer orders for HALO by the end of FY 2016 and submitted quotes to customers with HALO "placeholders," since the product had not been released.[46]  Varian publicly launched 360 Oncology with only five days left in the fiscal year. Nonetheless, the value of Varian's booked orders for 360 Oncology during that five-day period exceeded the value of its booked Equicare orders for all of FY 2016.[47]

Varian concealed its HALO commercialization efforts from Equicare in FY 2016.  To that end, Varian stopped sending sales reports to Equicare and falsely stated that it could not send the reports due to technical issues with its new ERP system.[48]  Varian also instructed its sales team to stop collaborating with Equicare staff on sales opportunities and cut Equicare out of customer

---

[39] *See* Ex. 17 (Equicare Posthearing Brief), *passim.*
[40] *See* Ex. 1 at 10-11; JX025.
[41] *See* Ex. 1 at 11-12; *see also* Ex. 17 at 18-20.
[42] *See* Ex. 1 at 7, 11; *see also* Ex. 17 at 18-20.
[43] *See* Ex. 1 at 10-12; *see also* Ex. 17 at 20-24.
[44] *See* Ex. 1 at 10-12; *see also* Ex. 17 at 20-24.
[45] *See* Ex. 1 at 12-13 & n.5; *see also* Ex. 17 at 25-28.
[46] *See* Ex. 1 at 13: *see also* Ex. 17 at 38-42.
[47] *Id.*
[48] *See* Ex. 1 at 9, 12.

interactions.[49]  All the while, Varian assured Equicare that HALO was not "even close to being ready" and that its sales staff was "tasked with selling what they have [*i.e.*, Equicare] and not what they don't have [*i.e.*, HALO]."[50]

Varian advised its sales staff to persuade customers to wait for HALO and formally instructed its sales staff to stop selling Equicare to new customers completely.[51]  Further, Varian took steps to decrease the marketability of Equicare.[52]  A key pillar of the HALO strategy was to prevent the further proliferation of Equicare's install base, in order to preserve those sockets.[53]  Notably, Varian did not allow a third-party partner, Flatiron Health, to make its software interoperable with Equicare, since Varian knew a lack of interoperability would make Equicare unviable for a large number of customers.  *Id.*

In short, as the Panel concluded, Equicare proved that Varian breached Section 2.2 by its failure to use "reasonable commercial effort" to sell Equicare products.  Ex. 1 at 17-18.  The Panel noted that "Varian's lack of conscious effort" was "largely undisputed" and listed a summary of facts that "stand out" regarding Varian's conduct (*see id.*):

- Not informing the Varian sales team of the FY '16 Sales Target;
- Failure to develop any strategy to reach the Sales Target;
- Withholding sales reports from Equicare in the key period, thereby masking the decline in sales volumes;
- Instructions to [the] Varian sales team to stop selling Equicare products;
- Omission of Equicare from Varian's FY 2016 business plan;
- In connection with the Flatiron contract, rejecting interoperability of OncoEMR with ECS;
- Rejecting supportive sales efforts of Equicare (such as training Varian staff);
- Lack of collaboration generally with Equicare sales team; and
- Possible breach of confidentiality provision of TARA.

### *Equicare's Damages*

Equicare argued that it suffered damages—in the form of lost profits—as a result of Varian's decision to stop selling Equicare products, which led to a dramatic sales decline after FY

---

[49] *See* Ex. 1 at 10, 12: *see also* Ex. 17 at 25-28.
[50] *See* Ex. 1 at 9-10, 12-13: Ex. 17 at 28-30.
[51] *See* Ex. 1 at 10-12.
[52] *See* Ex. 1 at 12.
[53] *See* Ex. 1 at 11-12; *see also* Ex. 17 at 32-35.

2015 (as pictured below).[54]



Equicare's damages expert submitted a report regarding his estimation of Equicare's lost profits, based in part on Varian's historical sales of Equicare products. *See* CX1589. As he explained—based on past sales results and growth rates—even under an overly conservative projection, Varian would have sold more than $5 million (the annual sales target in the TARA) in FY 2016, FY 2017 and FY 2018. CX1589 at 3, Sched. 6. Equicare's expert used that overly conservative $5 million figure as the starting point in his calculation of lost marginal profits. *Id.*

*Varian's Defense*

At the hearing, Varian argued that it did everything it could to sell Equicare products through FY 2018, but it failed to achieve sales due to saturation in the market for EHR software. *See* Ex. 1 at 10. Varian highlighted its disappointment in 360 Oncology sales, before it pulled the product off the market in 2020. Ex. 1 at 10, 15. Varian attributed its low sales volume for both Equicare and 360 Oncology to EHR market saturation. *Id.*

Equicare showed that Varian's market saturation argument was nonsensical. Most importantly, it falsely presupposes that Varian tried to sell Equicare in the first place. As the Panel found, "the absence of any real effort by Varian to sell [Equicare]" was "largely undisputed." Ex. 1 at 18-19. Even if market conditions might "somewhat" explain a drop in sales—as a matter of logic—Varian's "efforts" to sell Equicare could not have been thwarted by market conditions,

---

[54] The chart showing the decline in Equicare sales is from Varian's Posthearing Brief. *See* Ex. 18 (Varian Posthearing Brief) at 11.

1   when no such efforts existed in the first place.  Ex. 1 at 10, 19.  The resulting "lack of sales" are

2   "clearly proximately caused by [that] breach."  Ex. 1 at 21.

3        Further, Equicare offered undisputed evidence regarding why 360 Oncology failed to gain

4   market traction.[55]  Varian itself—and its own witness—admitted that 360 Oncology was never

5   finished and lacked key functionalities that Varian had promised to customers.[56]  Internal Varian

6   emails showed the same, including a company-wide memorandum that admitted 360 Oncology

7   failed due to its lack of product-readiness.[57]  Simply put, Varian could not sell 360 Oncology

8   because it was a bag of bolts, and the market rejected the product.

9        As the Panel noted, there is a relevant "distinction between established versus new" and

10  unproven products.  Ex. 1 at 22.  Varian's sales of 360 Oncology—a new product that was never

11  actually finished—do not shed light on the volume of sales that Varian could have achieved for

12  Equicare (had it tried).  Unlike 360 Oncology, "there [was] no issue of the status of Equicare as an

13  established business."  Ex. 1 at 22.

14       Finally, as the Panel recognized Varian's saturation argument concerned the wrong market.

15  *See* Ex.1 at 15 & n.6.  Varian's expert testified regarding the market for EHR and ancillary

16  products, but—as the Panel found—Equicare and 360 Oncology are specialized care coordination

17  products, rejecting Varian's narrow characterization of Equicare as an ancillary EHR product.  *Id.*

18  Varian's expert did not opine on the market for oncology care coordination software, but Varian

19  executives stated to investors—through 2019—that there was a tremendous and robust market for

20  care coordination products like 360 Oncology (and Equicare).[58]

21       **THE AWARD IS INEXPLICABLE**

22       The Panel issued the Award on July 12, 2021.  Arbitrator Dosker drafted the Award on

23  behalf of the Panel, as he noted in his invoice for post-hearing fees.[59]  Equicare was shocked by

24  the explanation of two issues in the Award.

---

25

26  [55] *See* Ex. 17 at 46-47.
    [56] *See id.*; Ex. 18 at 13 ("Of course, whether the product was released too soon does not matter.
27  Even if Equicare were correct, the fact that 360 Oncology suffered from product-related issues
    does not negate the negative market trends.").
    [57] *See* Ex. 17 at 46-47; JX171.
28  [58] *See* Ex. 1 at 15: CX1606; CX1594; CX1563; CX1561; CX1556.
    [59] *Compare* Ex. 19, Ex. 20, Ex. 21.

*First*, the Panel found that it could not award damages for Varian's breach. Ex.1 at 24. As explained *infra* pp. 22-24, the Panel's decision was in manifest disregard of the law because the Panel recognized that Equicare's lost profits damages were acceptable and recoverable under *Sargon*, the well-settled and plainly controlling case on the subject. Nonetheless, the Panel—without explanation—ignored *Sargon*.

*Second*, the Panel also found that, under Section 2.7 of the reseller agreements, the parties did not intend for the independent auditor's determinations to be final and binding. Ex. 1 at 27. Instead, the Panel took it upon itself to overrule the auditor. *Id.* Thereby, the Panel exceeded its own authority as previously determined—and concluded the opposite regarding the same contractual language it previously interpreted—in its Order No. 8. *See* Ex. 16 at 3.

### THE UNDISCLOSED RELATIONSHIP

Equicare was so stunned by the Award that it researched the backgrounds of the Arbitrators. Through its research, Equicare learned that Arbitrator Dosker had not disclosed a significant conflict of interest.

As it turned out, Ms. Ta represented Arbitrator Dosker in a multi-million-dollar malpractice lawsuit brought by his former client in San Francisco Superior Court, captioned *E-Pass Tech., Inc. v. Moses & Singer, LLP, Stephen N. Weiss, Squire Sanders (US) LLP, and Mark C. Dosker*, Case No. CGC-09-484009 (the "E-Pass Litigation").[60] Proof of their undisclosed attorney-client relationship is incontrovertible, spelled out in black and white on caption pages filed in that litigation (as pictured below).[61]

---

[60] *See* Liddiard Decl. at ¶¶ 17-18; Exs. 22-36.
[61] *See* Liddiard Decl. ¶¶ 17-18; Exs. 22-36.

It is implausible that either Arbitrator Dosker or Ms. Ta forgot about the E-Pass Litigation. It was a substantial enough that Arbitrator Dosker retained one of the most prestigious law firms in the country—Keker & Van Nest LLP ("Keker")—to represent him.[62] Moreover, at the time, both Ms. Ta and Arbitrator Dosker were prominent figures at their respective law firms. Ms. Ta was a partner at Keker, and Arbitrator Dosker was a partner in SPB's San Francisco office—both high-level and visible positions.[63]

On July 28, 2021, Equicare brought the undisclosed attorney-client relationship to the attention of AAA and Varian. *See* Ex. 38. Varian confirmed that, indeed, Ms. Ta had recalled her representation of Arbitrator Dosker all along. *See* Ex. 38; Ex. 39.

On November 18, 2019—ten days after Arbitrator Dosker submitted his disclosure form to the parties, which falsely stated that he had no attorney-client relationship with any party or party attorney—Ms. Ta submitted a "Confidential" disclosure to AAA, ***but not to Equicare***, which described the E-Pass Litigation matter:

> In or around 2013, Quyen L. Ta and one other partner at her former law firm, Keker, Van Nest & Peters LLP, represented Mark Dosker and his law firm, Squire Sanders LLP, in a legal malpractice suit, *E-pass Technologies, Inc. v. Moses & Singer, LLP, et al.*, No. CGC-09-484009 (Cal. Super. 2009). That matter was successfully resolved after extensive motion practice.

Ex. 39. Notwithstanding Varian's and AAA's awareness of Arbitrator Dosker's failure to disclose the E-Pass Litigation, nobody bothered to inform Equicare until August 2021. *See* Ex. 38; Ex. 39. As AAA confirmed on August 4, 2021, "no supplemental disclosures were submitted by Arbitrator Dosker" following his false submission on November 8, 2019, which stated that he had no attorney-client relationship with any party attorney. *See* Ex. 38; Ex. 7.

## ARGUMENT

Section 10 of the FAA (9 U.S.C. § 10) governs the enforcement and vacatur of contractual arbitrations arising out of contracts affecting interstate or foreign commerce. *See Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 270-73 (1995). Among other grounds, Section 10(a) of the FAA provides that an arbitral award may be vacated where: (i) "there was evident

---

[62] *See* Liddiard Decl. at ¶¶ 17-18.
[63] *See* Liddiard Decl. at ¶¶ 17-18.

partiality or corruption in the arbitrators, or either of them" or (ii) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  *See* 9 U.S.C. § 10(a)(2); 9 U.S.C. § 10(a)(4).

Here, the Award should be vacated for a number of reasons.  First, Arbitrator Dosker's failure to disclose his significant attorney-client relationship with Ms. Ta meets the "evident partiality" standard.  *Infra* Section I.  Second, the Award should be vacated because the Panel did not have the power to review the independent auditor's findings, as the Panel itself held in Order No. 8.  *Infra* Section II.  Third, the Award should be vacated because the Panel's denial of damages was in "manifest disregard" of well-settled law.  *Infra* Section III.

## I.  EVIDENT PARTIALITY BASED ON NONDISCLOSURE OF ARBITRATOR DOSKER'S ATTORNEY-CLIENT RELATIONSHIP WITH MS. TA

### A.  LEGAL STANDARD

Under Section 10(a)(2) of the FAA, an arbitral award should be vacated if "evident partiality" is found as to any arbitrator on a panel: "A finding of evident partiality in one arbitrator generally requires vacatur of the arbitration award."  *See Schmitz v. Zilveti*, 20 F.3d 1043, 1049 (9th Cir. 1994).  "This conclusion holds particularly when the other panel members vote with the evidently partial arbitrator."  *Id.*

In *Schmitz*, the Ninth Circuit identified two categories of "evident partiality" cases: (i) "actual bias cases" and (ii) "nondisclosure cases."  *Id.* at 1047-48.  Unlike actual bias cases, where "the integrity of the arbitrators' decision is directly at issue," nondisclosure cases require only "a failure to disclose that creates a reasonable impression of partiality" to support vacatur.  *Id.*

Accordingly, "a party seeking to vacate an arbitration award for evident partiality need not show that the arbitrator 'was actually guilty of fraud or bias in deciding th[e] case.'"  *New Regency Prods., Inc. v. Nippon Herald Films, Inc.*, 501 F.3d 1101, 1105 (9th Cir. 2007) (citing *Commonwealth Coatings Corp. v. Cont'l Cas. Co.*, 393 U.S. 145, 147-49 (1968)).  "Rather, the arbitrator's failure to disclose to the parties any dealings that might create an impression of possible bias is sufficient to support vacatur."  *Id.*; *Monster Energy Co. v. City Bevs., LLC*, 940 F.3d 1130, 1135-36 (9th Cir. 2019) (same).

### B.   ARBITRATOR DOSKER'S NONDISCLOSURE CREATES A "REASONABLE IMPRESSION OF PARTIALITY"

Here, Arbitrator Dosker's failure to disclose his attorney-client relationship with Ms. Ta creates a "reasonable impression of partiality" for three reasons.

*First*, the attorney-client relationship between Arbitrator Dosker and Varian's counsel is the type of "direct business or professional relationship" that courts find creates "a reasonable impression of partiality." *Morgan Keegan & Co. v. Grant*, 2010 U.S. Dist. LEXIS 152839, at *23 (C.D. Cal. June 30, 2010) (collecting cases).  The relationship is "direct, definite and capable of demonstration rather than remote, uncertain and speculative." *Lucile Packard Children's Hosp. v. U.S. Nursing Corp.*, 2002 U.S. Dist. LEXIS 10019, at *18 (N.D. Cal. May 29, 2002).

*Second*, Arbitrator Dosker had a duty to disclose his attorney-client relationship with Ms. Ta.  Under Rule 17(a) of the AAA Commercial Arbitration Rules, which applied to the Arbitration:

> Any person appointed or to be appointed as an arbitrator, as well as the parties and their representatives, shall disclose to the AAA any circumstances likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives.  Such obligation shall remain in effect throughout the arbitration.

Moreover, AAA notified Arbitrator Dosker of his disclosure obligations in the  "Notice of Appointment" and "CA Arbitrator Oath Form," which provided:

> It is most important that the parties have complete confidence in the arbitrator's impartiality. Therefore, please disclose any past or present relationship with the parties, their counsel, or potential witnesses, direct or indirect, whether financial, professional, social or of any other kind. This is a continuing obligation throughout our service on the case and should any additional direct or indirect contact arise during the course of the arbitration or if there is any change at any time in the biographical information that you have provided, it must also be disclosed. Any doubts should be resolved in favor of disclosure. If you are aware of direct or indirect contact with such individuals, please describe it below. (Ex. 7 at 1)

Most strikingly, Question No. 14 in the "CA Arbitrator Oath Form" specifically asked: "Do you have, or have you had any attorney-client relationship with a party or lawyer for a party." Ex. 7 at 4 ("Answer: NO").  The same form also instructed Arbitrator Dosker to consult CAL. CODE CIV. P. ("CCP") Section 1281.9 and the California Judicial Council's Ethics Standards for Neutral Arbitrators in Contractual Arbitration ("Arb. Ethics Standards"), both of which require disclosure

of any past or present attorney-client relationship between the arbitrator and an attorney for a party in the arbitration.  *See* CCP § 1281.9(a)(5); Arb. Ethics Standards § 7(d)(7).

Arbitrator Dosker's failure to make the plainly required disclosure warrants vacatur. Courts will find "a reasonable impression of partiality" where the arbitrator failed to fulfill a duty to disclose the relationship based on the applicable disclosure requirements in the case (*e.g.,* AAA rules, ethical codes, etc.).  *See, e.g., Schmitz*, 20 F.3d at 1049 (disclosures under NASD Code).[64]

There can be no doubt that Arbitrator Dosker knew "this was the type of conflict he was supposed to disclose" based on the clear language in Question No. 14 of the disclosure questionnaire he completed.  *Valrose Maui, Inc. v. Maclyn Morris, Inc.*, 105 F. Supp. 3d 1118, 1124 (D. Haw. 2000) (citing to AAA Notice of Appointment).  As the *Schmitz* court reasoned:

> "[T]he parties should choose their arbitrators intelligently. The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed." … "If the parties are to be judges of the arbitrators' partiality, ***duties to investigate and disclose conflicts must be enforced***."

20 F.3d at 1047, 1049 (emphasis added).

*Third*, where an arbitrator "knows of a material relationship with a party and fails to disclose it, a reasonable person would have to conclude that the arbitrator was evidently partial." *New Regency Prods.*, 501 F.3d at 1108.  Such is the case here.  Objectively, a "reasonable inference of partiality" can be inferred from Arbitrator Dosker's failure to disclose his material relationship.

## II.     THE PANEL EXCEEDED ITS POWER RELATED TO THE AUDIT

### A.     LEGAL STANDARD

Under Section 10(a)(4) of the FAA, an arbitral award may be vacated where "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a)(4).

The Ninth Circuit has held that "arbitrators 'exceed their power' when the award is completely irrational," which occurs only where "the arbitration decision fails to draw its essence

---

[64] *See also New Regent Prods.*, 501 F.3d at 1109-10 (considering, *inter alia*, AFMA rules and AAA ethics code); *Rosenhaus v. Jackson*, 2016 U.S. Dist. LEXIS 122398, at *16-18 (C.D. Cal. Feb. 26, 2016) (same); *HSMV Corp. v. ADI Ltd.*, 72 F. Supp. 2d 1122, 1128, n.12 (C.D. Cal. 1999) (same) ("The NASD Code is simply one of various sources that may impose upon arbitrators an 'independent duty'").

1   from the agreement." *Aspic Eng'g & Constr. Co. v. ECC Centcom Constructors LLC*, 913 F.3d

2   1162, 1166 (9th Cir. 2019).

3       "An arbitration award 'draws its essence from the agreement' if the award is derived from

4   the agreement, viewed 'in light of the agreement's language and context, as well as other

5   indications of the parties' intentions.'" *Id.*

6       **B.   THE PANEL'S DECISION TO REJECT THE INDEPENDENT AUDITOR'S**
        **CONCLUSIONS WAS IN EXCESS OF POWER BECAUSE IT WAS NOT "DERIVED**
7       **FROM THE AGREEMENT"**

8       An arbitrator may not "disregard contract provisions to achieve a desired result." *Aspic*,

9   913 F.3d at 1167; *Pacific Motor Trucking Co. v. Automotive Machinists Union*, 702 F.3d 176, 177

10  (9th Cir. 1983) (same).  If an arbitrator acknowledges that an outcome is "plainly required" by the

11  language in a contract, the arbitrator cannot "evad[e]" or "disregar[d]" such provisions "in an effort

12  to prevent what the Arbitrator deemed an unfair result." *Aspic*, 913 F.3d at 1168.

13      That is precisely what the Panel did here.  In August 2020, the independent auditor

14  submitted his final report to Equicare, after substantial time and resources were expended on the

15  audit, which found that Varian owed money to Equicare.  Varian refused to pay because they

16  disagreed with the independent auditor's findings.  The Parties briefed the Panel regarding whether

17  the audit provision (§ 2.7) of the reseller agreements allowed Varian to challenge the auditor's

18  findings as part of the Arbitration.

19      In their Order No. 8, notably issued after Ms. Ta's withdrawal from the Arbitration, the

20  Panel held—unequivocally—that the parties' agreements did not provide for arbitral review of the

21  auditor's findings, which were final and binding:

22          This wording plainly is an agreement between the parties that as to any audit claims,
            the audit results are final and binding on the parties. There is no conflict with the
23          arbitration provisions of the agreements which must be read together with the audit
            provisions of the agreements. The only limitation on the final nature of the audit
24          determination is the provision of Order No. 2 which expressly deferred resolution
            of any issue on the statute of limitations and any issue of novation, either of which
25          may or may not affect some of the determinations made in the audit report.

26  *See* Ex. 16 at 3.  Indeed, given that Equicare and the Panel could not receive information related

27  to the audit—other than the final amount due—there was no way to defend or relitigate the

28  auditor's findings at the hearing (*supra* pp. 9-12).

Notwithstanding its plain recognition of the final and binding nature of the audit under the parties' reseller agreements, after Ms. Ta re-emerged as Varian's counsel in the Arbitration, the Panel came to the opposite conclusion in the Award, in order to excuse Varian from paying.

> Of the cases relied on by Equicare on this point, it appears that where the parties by express wording in their contract or by clear intent expect the results of the third party's determination to be binding, it is. Here, however, there is no such working in § 2.7, and no reasonable inference can be made from the provision that that was the parties' intention.

Ex. 1 at 27.  Based on its new interpretation of the exact same provision, the Panel held that it was "obligated" to correct—what it believed to be—the auditor's "mistakes," thereby denying Equicare $1,688,177 in amounts owed plus $307,911 in audit costs.  Ex. 1 at 27-29.

As in *Aspic*, the Panel's conclusion that certain "mistakes" in the auditor's findings "ought to be addressed" was merely a "rationalization" to avoid a result that the Panel found "unjust." *Aspic*, 913 F.3d at 1168.[65]  It was not derived from the agreement and, thus, "irrational." *Id.*

The award should be vacated.

### III.   THE PANEL'S DENIAL OF DAMAGES FOR VARIAN'S BREACH OF CONTRACT WAS IN MANIFEST DISREGARD OF THE LAW

#### A.   LEGAL STANDARD

The Ninth Circuit has held that "the manifest disregard ground for vacatur is shorthand for a statutory ground under the FAA, specifically 9 U.S.C. § 10(a)(4)." *Comedy Club, Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1290 (9th Cir. 2009).  An award is in manifest disregard of the law if an arbitrator "recognized the applicable law and then ignored it." *Id.*

#### B.   THE PANEL RECOGNIZED AND IGNORED APPLICABLE LAW

The Panel found that Varian breached Section 2.2 of the reseller agreement when it stopped trying to sell Equicare products, instructed its sales team to stop selling—and affirmatively prevented—new sales. *Supra* pp. 12-14.  As a matter of common-sense, the Panel found that damages from lost sales were "clearly proximately caused by the breach of § 2.2." *Id.* at 21.

Nonetheless, the Panel held that it "[could not] award damages for the breach" because

---

[65] It is worth reemphasizing that the Panel concluded the auditor's findings were "erroneous" based on the one-sided arguments advanced by Varian at the hearing, to which Equicare objected on the grounds that the neither the auditor nor Equicare could defend the audit findings at the hearing.

1    Equicare failed to provide a calculation of "non-speculative" lost profits damages.  *Id.* at 21-23.

2           In its analysis, the Panel correctly identified *Sargon* as the well-established standard under

3    California law for determining whether lost profits are reasonably certain and recoverable versus

4    speculative and not recoverable.  Ex. 1 at 21-22.  The Panel also noted findings that would have

5    compelled it to find that Equicare's damages were non-speculative if it applied *Sargon*.

6           The Panel found that Varian's breach caused damages and twice highlighted its

7    "mindful[ness]" of *Sargon*'s direction that:

8           Where the *fact* of damages is certain, the amount of damages need not be calculated
            with absolute certainty. The law requires only that some reasonable basis of
9           computation of damages be used and the damages may be computed even if the
            result reached is an approximation.

10          This is especially true where … it is the wrongful acts of the defendant that have
            created the difficulty in proving the amount of loss of profits or where it is the
11          wrongful acts of the defendant that have caused the other party to not realize a profit
            to which that party is entitled.
12

13   *See* Ex. 1 at 21-23 (quoting *Sargon*).  The Panel made clear that there was no way to determine

14   the actual amount of Equicare sales Varian would have made during the relevant period, since it

15   instructed its staff not to sell Equicare (Ex. 1 at 10) and removed nearly all of the two hundred

16   opportunities that had been in the Equicare pipeline at the end of FY 2015 (Ex. 1 at 12, n.5).

17          Critically, the Panel held that Equicare sales through the Varian channel constituted an

18   "established business" under *Sargon*: "the discussion of the distinction between established versus

19   new business ventures is omitted—Equicare and Varian have a long business relationship, and

20   there is no issue of the status of Equicare as an established business."  Ex. 1 at 22.  Tellingly, the

21   Panel acknowledged that it omitted the most critical portion of *Sargon*:

22          Regarding lost business profits, the cases have generally distinguished between
            established and unestablished businesses. Where the operation of an established
23          business is prevented or interrupted, as by a … breach of contract …, damages for
            the loss of prospective profits that otherwise might have been made from its
24          operation are generally recoverable for the reason that their occurrence and extent
            may be ascertained with reasonable certainty from the past volume of business and
25          other provable data relevant to the probably future sales. … [R]ecovery will not be
            denied because the amount cannot be shown with mathematical precision.
26          ***Historical data, such as past business volume, supply an acceptable basis for
            ascertaining lost future profits***.
27

28   55 Cal. 4th at 774 (emphasis added).  That omission is even more stark given Arbitrator Dosker's

-23-

written opinion in another arbitration, *Int'l Petroleum Products and Additives Co., Inc. v. Black Gold, S.A.R.L., et al.*, Ref No. 01-18-0001-9728 ("*Black Gold*"), which involved substantially similar circumstances.[66]

In *Black Gold*, Arbitrator Dosker demonstrated that he knew how to apply *Sargon*:

> IPAC seeks lost profit damages, calculated based on historical data from IPAC's sales. California law recognizes that as an acceptable basis for ascertaining lost future profits. *Sargon Enters., Inc. v. University of Southern Cal.*, 55 Cal. 4th 747, 774 (2012) ('Historical data, such as past business volume, supply an acceptable basis for ascertaining lost future profits.').

Ex. 37 (Final Award, *Black Gold*) at 22.

Here, the Panel knew that Equicare had calculated lost profits based on historical data.  The Award identified CX1589, which notes Equicare's use of historical data to calculate damages:

> The marginal, or variable, profit percentage is calculated by looking at Equicare's historic marginal profit margins. The TARA set an annual sales target of $5,000,000 for FYE September 30, 2016.  Based on the actual performance of Equicare sales through Varian prior to FY 2016 and Varian's own projections for Equicare sales, it is reasonable to assume that the $5,000,000 sales target would have been exceeded. …  Several other factors support Equicare achieving the $5,000,000 target amount for FYE 2016, 2017 and 2018. First it was the agreed-upon target amount. Second, sales for FYE were in excess of $5,000,000. Third, this target is consistent with contemporaneous documents prepared in 2014 which showed projections in excess of $5,000,000.  (CX1589 at 3 & n.7)

Schedule 6 of the report provides the historical data supports the lost profits calculation. *See* CX1589 at 13.  The Panel, however, simply ignored *Sargon* and failed to consider whether Equicare's use of historical data to calculate lost profit damages was an acceptable basis.

Plainly, it was.[67]  "Even under the permissive standard with which [courts] view arbitral decisions," a Panel is not free to ignore case law that it acknowledges to be applicable.  *Comedy Club Inc.*, 553 F.3d at 1293.  The Panel did so here.

### CONCLUSION

For the foregoing reasons, the Court should vacate the Award.

---

[66] *See* Ex. 37 (Final Award, *Black Gold*).

[67] Moreover, the Panel's denied Equicare damages based on the kind of speculative information that *Sargon* expressly held to be unreliable. Specifically, the Panel alluded Varian's own sales of 360 Oncology, which was a new (and unfinished) product and, thus, an unreliable basis for comparison under *Sargon*. 55 Cal. 4th at 774-75. Similarly, the Panel compared Equicare's direct sales results, by its two-person sales team, to what Varian's—a massive company—which is precisely the apples-to-oranges comparison rejected by *Sargon*.  55 Cal. 4th at 765-66.

1

Dated:  August 5, 2021

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


By: */s/ Dylan J. Liddiard*
      Dylan J. Liddiard
      dliddiard@wsgr.com

Attorneys for Petitioner
Equicare Health Inc.

MP&A iso Equicare's Petition to
Vacate Arbitration Award
Case No.: 21-MC-80183